UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

ANATOLIY ANDREYUK and JENNY
FELIPPELLI, *as Executor of the Estate
of* JOSE FELIPPELLI,

                          Plaintiffs,                  **DECISION AND ORDER**

           -against-                      19 Civ. 7476 (AEK)

ASF CONSTRUCTION & EXCAVATION
CORP. and ANDRE FERNANDEZ,

                         Defendants.
-------------------------------------------------------------x

**THE HONORABLE ANDREW E. KRAUSE, U.S.M.J.[1]**

      Plaintiffs Anatoliy Andreyuk and Jenny Felippelli, in her capacity as executor of the

estate of Jose Felippelli,[2] bring this action against Defendants ASF Construction & Excavation

Corp. ("ASF") and Andre Fernandez seeking unpaid wages, liquidated damages, statutory

penalties, and attorneys' fees and costs pursuant to the Fair Labor Standards Act, 29 U.S.C. §

201 *et seq.* ("FLSA") and the New York Labor Law, §§ 190-199A, 650-665 ("NYLL").  ECF

No. 26 ("Am. Compl.").  Currently before the Court is Defendants' motion for summary

---

[1] On or about August 19, 2020, the parties submitted a fully executed Form AO 85, "Notice, Consent, and Reference of A Civil Action to A Magistrate Judge," consenting to the reassignment of this matter to a United States Magistrate Judge in accordance with 28 U.S.C. § 636(c).  The Honorable Cathy Seibel endorsed and docketed the form on August 20, 2020, ECF No. 36, and the matter was reassigned to the Honorable Paul E. Davison.  The case was reassigned to the undersigned on October 15, 2020.

[2] The parties spell Felippelli's name inconsistently across their documents.  *See, e.g.*, ECF No. 76 ¶ 6 ("Plaintiff Fe*ll*ippelli was substituted as a party in favor of Jenny Fe*ll*ippelli in her capacity as Executor of the Estate of Jose Fe*li*ppelli." (emphasis added)).  For the sake of consistency and clarity, the Court adopts the spelling used in the Declaration of Jenny Felippelli filed at ECF No. 64, in which the spelling of the decedent's name is consistent with the attached decree from New York State Surrogate's Court, ECF No. 64-1.

judgment, ECF Nos. 68 (Notice of Motion), 70 (Memorandum of Law, or "Defs.' Mem."), and Plaintiffs' cross-motion for summary judgment, ECF No. 72 ("Pls.' Mem.").  For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART and Plaintiffs' cross-motion is DENIED.

## BACKGROUND

### A.  Factual Background

The following facts—which are undisputed, unless otherwise noted—are taken from Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts, ECF No. 71 ("Defs.' 56.1 Statement"), Plaintiffs' Statement of Undisputed Material Facts, ECF No. 75 ("Pls.' 56.1 Statement"), Plaintiffs' Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts, ECF No. 76 ("Pls.' Resp. to Defs.' 56.1 Statement"), Defendants' Counterstatement of Undisputed Material Facts, ECF No. 79 ("Defs.' Resp. to Pls.' 56.1 Statement"), and the exhibits submitted in connection with Defendants' motion and Plaintiffs' opposition and cross-motion.

ASF is a concrete construction and excavation company that is registered to do business in New York.  Defs.' 56.1 Statement ¶ 7.  ASF is owned by Fernandez and Annette Simao ("Simao").  *Id.* ¶ 8.  During the period relevant to this action, Fernandez had the power to hire, fire, set wages, maintain payroll records, and set work rules for employees of ASF, while Simao was responsible for handling payroll as well as overseeing other administrative matters.  Pls.' 56.1 Statement ¶¶ 1, 3.  ASF maintains a yard at 37 Roa Hook Road in Cortlandt Manor, New York, where ASF stores construction materials and construction vehicles.  Defs.' 56.1 Statement ¶¶ 9, 10; ECF No. 73 ("Andreyuk Decl.") ¶ 3.

1.    **Andreyuk**

Andreyuk was hired by ASF on or around July 23, 2016, and began working for ASF the week of October 17, 2016.  Defs.' 56.1 Statement ¶ 11; Pls.' 56.1 Statement ¶ 34.  Andreyuk was terminated from his position with ASF in March 2019.[3]  Defs.' 56.1 Statement ¶ 12; Pls.' 56.1 Statement ¶ 35.  In connection with his employment, Andreyuk was provided with a two-bedroom apartment that was paid for by ASF and located on the same property as the yard in Cortlandt Manor; Plaintiff was not charged rent for this apartment, and Defendant paid for the utilities.  Defs.' 56.1 Statement ¶¶ 30-32, 34-36.  ASF also provided Andreyuk with a vehicle for his own personal use, a gas card to fuel the vehicle, car insurance, and a cell phone.  *Id.* ¶¶ 37-40.

The parties dispute nearly every other aspect of Andreyuk's employment that is material to this litigation.  Defendants assert that Andreyuk was a "yard supervisor" between 2016 and 2019, and that his role required him to supervise yard operations, oversee management of material storage and equipment, and ensure that ASF's trucks were loaded and unloaded on a daily basis.  *Id.* ¶¶ 13-16; El-Hag Decl. Ex. T ("Fernandez Dep. Tr.") at 26:6-14.  According to Defendants, Andreyuk supervised between two and eight employees at any given time.  Defs.' 56.1 Statement ¶¶ 17-18.  Defendants maintain that Andreyuk advised Fernandez on matters concerning the hiring and firing of employees and had the authority to terminate employees if they were acting in a manner he deemed to be unsafe.  *Id.* ¶¶ 22-23, 25.  Defendants further assert that Andreyuk received a weekly salary throughout his employment—his salary began at

---

[3] Defendants assert that Andreyuk was terminated on or about March 22, 2019, Defs.' 56.1 Statement ¶ 12, while Plaintiffs maintain the termination date was March 27, 2019, Pls.' 56.1 Statement ¶ 35.  Neither Defendants nor Plaintiffs dispute the termination date cited by the other.  The termination letter cited by both parties in support of this fact states that Andreyuk's "employment and contract board [and] vehicle agreement" were terminated as of March 27, 2019.  ECF No. 69 ("Zabell Decl.") Ex. 7; ECF No. 74 ("El-Hag Decl.") Ex. H.

$960 per week, and was raised to $1,080 per week on or about November 8, 2018. *Id.* ¶¶ 28-29; El-Hag Decl. Ex. U ("Simao Dep. Tr.") at 29:21-30:2.

Plaintiffs dispute Defendants' proffered facts and instead maintain that Defendants employed Andreyuk as a "yard laborer," Andreyuk Decl. ¶ 3, whose role entailed assisting the other yard workers with tasks such as loading and unloading trucks, and inspecting material, Pls.' 56.1 Statement ¶¶ 37-39. According to Plaintiffs, Andreyuk held the position of "lead yard worker" for one year, during which time he was responsible for deciding the order that the yard workers would accomplish the days' work and the strategy with which to do so. *Id.* ¶ 39; El-Hag Decl. Ex. Y ("Andreyuk Dep. Tr.")[4] at 82:5-25. Andreyuk testified that after holding the position of lead yard worker for one year in 2016, the job was taken over by another employee who oversaw yard work from 2017 onward.[5] Andreyuk Dep. Tr. at 82:5-25. Plaintiffs state that Andreyuk could not hire or fire employees or determine employee pay rates. Pls.' 56.1 Statement ¶ 40-41. Plaintiffs further assert that Andreyuk and Fernandez had an oral agreement that Andreyuk would work approximately 40 hours per week.[6] *Id.* ¶ 50. In addition, Plaintiffs contend that Andreyuk was paid only for those days that he actually worked and was not paid on a salary basis. *Id.* ¶ 51.

---

[4] The parties did not submit the full transcript of the Andreyuk deposition, but rather attached transcript excerpts to three separate filings. *See* ECF Nos. 69-3, 74-17, 77-3. The specific pages of the deposition that were attached to each filing are as follows: ECF No. 69-3 (pages 11, 16, 34, 79, 95-97, 111); ECF No. 74-17 (pages 25, 79-83); ECF No. 77-3 (pages 19-20, 80-82). A citation to the "Andreyuk Deposition," refers to one of these three filings.

[5] Plaintiffs provide no details concerning how, if at all, Andreyuk's role changed after another lead yard worker took over.

[6] Fernandez testified at his deposition that his agreement with Andreyuk was an oral agreement that was never committed to writing. Fernandez Dep. Tr. at 33:14-34:8.

### 2.   Felippelli

Felippelli began working for ASF during the spring of 2017,[7] and worked for ASF through January 23, 2020.  Pls.' 56.1 Statement ¶ 63.  He was employed as a driver, and his responsibilities included transporting materials to and from job sites where ASF employees performed work.  Defs.' 56.1 Statement ¶¶ 43-44.  Though Felippelli primarily worked out of the yard at 37 Roa Hook Road, he also sometimes worked out of another yard located at 1223 Park Street in Peekskill, New York.  *Id.* ¶¶ 58-59.  He was compensated at an hourly rate—he was supposed to receive a regular rate of pay for hours worked up to 40 hours per week, and an overtime rate equal to 1.5 times his regular rate of pay for every hour worked in excess of 40 hours per week.  *Id.* ¶¶ 46-47.  From the start of his employment until January 17, 2019, Felippelli was compensated at a regular rate of $25 per hour; thereafter he was compensated at a regular rate of $30 per hour.  *Id.* ¶¶ 48-49.  In addition to receiving a paycheck, Felippelli was occasionally paid in cash.  *Id.* ¶¶ 60-61.[8]  According to Defendants, this arrangement was per the preference of Felippelli, who requested that any overtime wages be paid to him in cash for "insurance purposes."  *Id.* ¶ 61; *see* Simao Dep. Tr. 88:8-15.

---

[7] Plaintiffs assert that Felippelli's employment began on or about April 4, 2017, while Defendants maintain he did not begin working until June 26, 2017.  *Compare* Pls.' 56.1 Statement ¶ 63 *with* Defs.' 56.1 Statement ¶ 41.  Neither Defendants nor Plaintiffs dispute the start date cited by the other.  This minor factual inconsistency is not material to the Court's decision on these motions.

[8] Plaintiffs admit the facts in paragraphs 60 and 61 "to the extent that Mr. Fellippelli [*sic*] cannot provide contrary evidence because he passed away."  Pls.' Resp. to Defs.' 56.1 Statement ¶¶ 60-61.  Accordingly, the Court construes these as admitted facts.

Plaintiffs assert, and Defendants nominally dispute,[9] that from the time Felippelli was

hired in 2017 through the summer of 2018,[10] ASF tracked his hours manually.  Pls.' 56.1

Statement ¶ 11; *see also* Simao Dep. Tr. at 9:9-13, 10:2-12:6; El-Hag Decl. Ex. K at 1

(transaction log beginning August 20, 2018).  Plaintiffs further state that an on-duty foreman was

responsible for maintaining daily work time sheets for employees like Felippelli, which were

sent to ASF at the end of every week.  Pls.' 56.1 Statement ¶ 11; Simao Dep. Tr. at 10:2-21.

Simao compiled and submitted employee work hours every payroll period to a third party payroll

processing company.  Pls.' 56.1 Statement ¶ 10; Simao Dep. Tr. at 7:4-10.  Defendants no longer

have any time sheet records from this period.  Simao Dep. Tr. at 15:1-22.  Beginning in 2018,

ASF instituted biometric time tracking in its construction yards; Felippelli "punched in" at the

beginning of every workday and "punched out" at the end of the workday using biometric

devices.  Defs.' 56.1 Statement ¶¶ 51-53.  The parties dispute whether Defendants used

biometric tracking data to compute Felippelli's pay.  *Compare* Pls.' 56.1 Statement ¶ 16 *with*

Defs.' Resp. to Pls.' 56.1 Statement ¶ 16.

## B. Procedural History

Plaintiff Andreyuk initiated this action by filing a complaint on August 9, 2019.  ECF No.

1.  In March 2020, Plaintiffs filed the operative First Amended Complaint, which added

---

[9] Defendants dispute the facts set forth in paragraph 11 of Plaintiffs' 56.1 Statement, but only by stating that "[t]he cited portion of the evidentiary record does not support the proposed statement of fact," without any citation to any contrary evidence.  Defs.' Resp. to Pls.' 56.1 Statement ¶ 11.  To the extent Defendants have responded this way because of the apparent typographical error discussed in n.9, *infra*, this fact is not actually in dispute.

[10] Plaintiffs' 56.1 Statement states that the manual time sheet system was used until "the summer of 2008."  Pls.' 56.1 Statement ¶ 11.  The Court assumes that this is a typographical error and that Plaintiffs meant to write "2018," given that the cited testimony refers to "summer 2018."  *See* Simao Dep. Tr. at 9:9-13.

Felippelli as a plaintiff, ECF No. 26;[11] Defendants filed their answer to the First Amended

Complaint on March 25, 2020, ECF No. 23.  On March 3, 2021, Defendants filed a suggestion of

death upon the record as to Felippelli.  ECF No. 59.  On May 11, 2021, Plaintiffs moved to

substitute Jenny Felippelli, in her capacity as the executor of Jose Felippelli's estate, as a

plaintiff.  ECF Nos. 62-64.  Defendants did not oppose the motion, and the Court issued an order

granting Plaintiffs' motion to substitute on July 12, 2021.  ECF No. 66.

On October 1, 2021, Defendants filed their motion for summary judgment.[12]  ECF Nos.

68-71.  Plaintiffs filed their opposition and cross-motion for summary judgment on October 14,

2021, ECF Nos. 72-76, and Defendants filed their opposition to Plaintiffs' cross-motion and

reply in further support of their motion on November 22, 2021, ECF Nos. 77-79.  The motions

became fully submitted on December 9, 2021 when Plaintiffs filed their reply in further support

of their cross-motion.  ECF No. 80.

## DISCUSSION

### A.  Legal Standard for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should

be granted "if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.

v. Catrett*, 477 U.S. 317, 320-23 (1986).  A dispute about a material fact is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

---

[11] Plaintiffs' first attempt at filing the First Amended Complaint on March 25, 2020 was rejected due to procedural errors, and the Clerk of Court directed Plaintiffs to re-file the deficient pleading.  Plaintiffs re-filed the First Amended Complaint on March 27, 2020.

[12] Defendants originally attempted to file their motion on September 22, 2021, but that filing was rejected by the Clerk of Court for certain deficiencies.  Defendants re-filed the motion on October 1, 2021.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor."  *Mount Vernon Fire Ins. Co. v. Belize N.Y., Inc.*, 277 F.3d 232, 236 (2d Cir. 2002); *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 97 (2d Cir. 2001); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 764 (2d Cir. 1998); *see also Anderson*, 477 U.S. at 261 n.2.  A party cannot overcome summary judgment by relying on "mere speculation or conjecture as to the true nature of the facts" because "conclusory allegations or denials" cannot "create" genuine disputes of material fact "where none would otherwise exist."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quotation marks omitted). When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (quotation marks omitted).

### B.  FLSA and NYLL Minimum Wage and Overtime Wages Claims

Plaintiffs have both brought claims against Defendants alleging violations of state and federal laws mandating that employees be paid minimum wage and overtime wages.

Both the FLSA and the NYLL contain provisions prohibiting employers from paying their employees at a rate lower than a certain minimum hourly wage.  *See* 29 U.S.C. § 206(a)(1); NYLL § 652.  The minimum wage under the FLSA during the relevant period was $7.25 per hour, *see* 29 U.S.C. § 206(a)(1); under the NYLL, the minimum wage in Westchester County was $9.00 per hour in 2016, $10.00 per hour in 2017, $11.00 per hour in 2018, $12.00 per hour in 2019, and $13.00 per hour in 2020.  NYLL § 652(1)(b); *see History of the Minimum Wage in*

*New York State*, available at https://dol.ny.gov/history-minimum-wage-new-york-state (last visited Sept. 30, 2022).

Additionally, under the FLSA, subject to certain exceptions, an employee who works more than 40 hours per week must receive compensation for each hour worked beyond 40 hours per week "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). The NYLL and its corresponding regulations have analogous requirements. *See* 12 N.Y.C.R.R. § 142-2.2.

### 1. The Executive Exemption Defense to Andreyuk's Minimum Wage and Overtime Wages Claims

Defendants seek summary judgment as to Plaintiff Andreyuk's minimum wage and overtime claims based on the affirmative defense that Andreyuk was a "*bona fide* executive employee," and was therefore exempt from state and federal laws concerning minimum wage and overtime wages.[13] Defs.' Mem. at 5-9.

Both the federal and state statutory schemes provide that minimum wage and overtime-pay rules "shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1); *see* 12 N.Y.C.R.R. § 142-2.14(c)(4) (exempting "a *bona fide* executive" from definition of "employee" within regulations that also include minimum wage and overtime provisions); *Awan v. Durrani*, No. 14-cv-4562 (SIL), 2015 WL 4000139, at \*9 (E.D.N.Y. July 1, 2015) ("just as the FLSA and its regulations

---

[13] In their answer to the Amended Complaint, Defendants appear to admit that Andreyuk was not exempt from FLSA and NYLL overtime provisions while employed by ASF. *See* ECF No. 23 ("Answer") ¶¶ 44-46; *see also* Compl. ¶¶ 44-46. But also in their answer, Defendants assert the affirmative defense that Plaintiffs' claims are barred to the extent the work they performed falls within exemptions provided for by the FLSA. Answer ¶ 106. The parties do not meaningfully address these contradicting statements in their submissions. Accordingly, the Court does not discuss the significance of these potential admissions by Defendants in deciding these motions, but expects to address this with the parties at future proceedings.

define and exempt from its minimum wage and overtime requirements persons employed in a

bona fide executive . . . capacity, the NYLL and its implementing regulations exempt from its

wage and overtime provisions individuals who work in an executive . . . capacity" (cleaned

up)).[14]  The FLSA does not define what it means to work in an executive capacity; instead, the

statute directs the Secretary of the United States Department of Labor ("DOL") to define the

term through regulations.  *See Ramos*, 687 F.3d at 559 (citing 29 U.S.C. § 213(a)(1)).  DOL

regulations provide that "[t]he term 'employee employed in a bona fide executive capacity' . . .

shall mean any employee:

> (1)   Compensated on a salary basis . . . at a rate of not less than $684
>       per week . . . , exclusive of board, lodging or other facilities;
>
> (2)   Whose primary duty is management of the enterprise in which the
>       employee is employed or of a customarily recognized department
>       or subdivision thereof;
>
> (3)   Who customarily and regularly directs the work of two or more
>       other employees; and
>
> (4)   Who has the authority to hire or fire other employees or whose
>       suggestions and recommendations as to the hiring, firing,
>       advancement, promotion or any other change of status of other
>       employees are given particular weight."

29 C.F.R. § 541.100(a).  "Courts analyze these criteria in terms of a 'salary basis' component

and a 'duties' component."  *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 520

(S.D.N.Y. 2013).  With respect to the "duties" portion—factors (2) through (4)—

"[c]onsideration of these factors is a highly fact-intensive inquiry, to be made on a case-by-case

basis in light of the totality of the circumstances."  *Id.* at 523 (quotation marks omitted).  The

---

[14] Because the NYLL "applies the same exemptions as the FLSA," it is not necessary to engage in a separate analysis of the applicability of the *bona fide* executive exemption pursuant to the NYLL.  *See Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554, 556 n.1 (2d Cir. 2012).

NYLL executive capacity exemption mirrors the FLSA.  *See* 12 N.Y.C.R.R. § 142-2.14(c)(4)(i).[15]

The applicability of the executive capacity exemption under the FLSA "is a mixed question of law and fact."  *Ramos*, 687 F.3d at 558 (quotation marks omitted).  "The question of how the employees spent their working time is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law."  *Id.* (cleaned up).

As recently as 2014, the Second Circuit instructed courts to "narrowly construe" exemptions such as the "*bona fide* executive" exemption to effectuate the remedial purpose of the FLSA.  *See, e.g.*, *Pippins v. KPMG, LLP*, 759 F.3d 235, 238 (2d Cir. 2014); *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991).  Thereafter, the Supreme Court expressly rejected that approach, and instead instructed that because "exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement," courts have "no license to give [an] exemption anything but a fair reading."  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *accord Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128-29 (2d Cir. 2020).  The "employer bears the burden of proving that its employees fall within an exempted category of the [FLSA]."  *Martin*, 949 F.2d at 614; *see Isett*, 947 F.3d at 128.

---

[15] The base salary requirement under the NYLL for a *bona fide* executive employee is greater than that under the FLSA.  *See* 12 N.Y.C.R.R. § 142-2.14.  New York State regulations show an upward trend in minimum weekly earnings for executive employees, just as they do for non-exempt employees.  The current version of the regulation states that between December 31, 2016 and December 30, 2017, the minimum weekly salary for an executive employee in Westchester County was $750 per week.  12 N.Y.C.R.R. § 142-2.14(c)(4)(i)(e)(2).  When Andreyuk was terminated in 2019, the minimum wage for an executive employee in Westchester County had increased to $900 per week.  *Id.*

a.  **Salary Test**

Compensation is earned on a "salary basis" "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed."  29 C.F.R. § 541.602.  Subject to enumerated exceptions, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked."  *Id.*; *see also Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 164 (2d Cir. 2008) ("[O]nce the fixed minimum portion of an employee's compensation has been determined, any reduction below that set amount would, in most circumstances, violate the 'salary-basis test.'" (citations omitted)). The regulation does permit deductions from an exempt employee's pay for certain specified reasons, including when the employee "is absent from work for one or more full days for personal reasons, other than sickness or disability," 29 C.F.R. § 541.602(b)(1), "for absences of one or more full days occasioned by sickness or disability (including work-related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability," 29 C.F.R. § 541.602(b)(2), and "for unpaid disciplinary suspensions of one or more full days imposed in good faith for infractions of workplace conduct rules . . . pursuant to a written policy applicable to all employees," 29 C.F.R. § 541.602(b)(5).  "In contrast, an employee does lose his exempt status (and therefore must be paid overtime) when his salary is subject to reductions for, *inter alia*, partial-day absences for personal reasons, including lateness, sickness, or disability . . . or disciplinary reasons other than penalties imposed in good faith for infractions of safety rules of major significance."  *McCloskey v. Triborough Bridge*, 903 F. Supp. 558, 562-63 (S.D.N.Y.

1995) (quotation marks omitted); *Scholtisek v. Eldre Corp.*, 697 F. Supp. 2d 445, 451-54 (W.D.N.Y. 2010) ("Docking an employee's pay to reflect a partial day absence is not consistent with an intent to pay the employee on a salary basis under th[e] test."). An employee's exempt status is lost only "'if there is either an actual practice of making [improper] deductions or an employment policy that creates a 'significant likelihood' of such deductions.'" *Anani v. CVS RX Servs., Inc.*, 788 F. Supp. 2d 55, 64 (E.D.N.Y. 2011) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997); *Ahern v. Cnty. of Nassau*, 118 F.3d 118 (2d Cir. 1997)). The overarching inquiry is "whether the employer's practices reflect an objective intention to pay its employees on a salaried basis." *Yourman v. Giuliani*, 229 F.3d 124, 130 (2d Cir. 2000) (cleaned up).

Based on the record before the Court, there are questions of fact as to whether Defendants intended to pay Andreyuk on a salaried basis. The documentary and testimonial evidence is contradictory and shows that Andreyuk's compensation was not always consistent. Andreyuk testified that during the first four months of his employment—between October 17, 2016 and February 15, 2017—he received cash payments and that he was paid $960 per week. Andreyuk Dep. Tr. at 19:6-20:12; *see also* Simao Dep. Tr. at 11:1-19 (explaining that during this period Andreyuk's time was logged using time sheets that are no longer in existence); El-Hag Decl. Ex. E at 1 (earning record showing Andreyuk's first check date as February 22, 2017). Payroll records show that Andreyuk continued to receive weekly payments beginning February 22, 2017, and those payments were often, but not always, in the amount of $960. El-Hag Decl. Ex. E at 1-4, 6-9. Between February 22, 2017 and November 1, 2018, Andreyuk received a weekly $960 payment in 71 out of 90 pay periods. *Id.* Fernandez also testified that Andreyuk was paid a salary in accordance with an oral agreement that Fernandez and Andreyuk made when Andreyuk was hired. Fernandez Dep. Tr. at 52:15-22. Fernandez further testified that ASF did not pay

Andreyuk overtime, and did not track his hours, because "[w]e pay him a set price." *Id.* at 54:7-19.

But other evidence contradicts Defendants' representation that Andreyuk was paid a salary. Simao, who was in charge of payroll at ASF, testified that Andreyuk was not paid for days that he did not work, providing the example that on days when Andreyuk decided to go to the beach instead, he would not be paid. Simao Dep. Tr. at 29:21-30:8. Simao also testified that it was possible that Andreyuk was not paid for days that he was sick and could not work. *Id.* at 38:23-39:6 ("If Anatoliy said that he was sick and couldn't work, then he may or may not have been paid. I'm not sure."). While deductions may be made for "one or more full days in response to an employee's absence for personal reasons" without affecting the employee's status as an exempt employee, *Coleman-Edwards v. Simpson*, 330 F. App'x 218, 220 (2d Cir. 2009) (summary order), deductions may only be made "for absences of one or more full days occasioned by sickness or disability (including work-related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability," 29 C.F.R. § 541.602(b)(2). There is no evidence in the record of any sick leave plan or policy at ASF, and therefore any deductions that may have been made to Andreyuk's pay based on absences due to illness may undermine the assertion that Andreyuk was paid on a salary basis.

Moreover, between February 22, 2017 and November 1, 2018, in weeks when Andreyuk earned less than $960, ASF payroll records show earnings in the amounts of $880, $760, and $800. El-Hag Decl. Ex. E at 1-4. If Andreyuk's pay was being permissibly deducted for full day absences, one reasonable interpretation of these rates of pay is that the $960 figure is based on a computation of $160 per day, and therefore a payment of $800 for one week could reflect a

deduction of one day's pay for an absence for personal reasons. This same logic, however, would suggest that in the weeks when Andreyuk was paid $880, his pay was reduced for a half-day absence, and in weeks when he was paid $760, his pay was reduced for 1.25 days of absence. Reductions for partial-day absences are inconsistent with compensation being paid on a salaried basis. *See Scholtisek*, 697 F. Supp. 2d at 451-54.

During other weeks, Andreyuk was paid *more* than $960, *see, e.g.*, El-Hag Decl. Ex. E at 3 (showing earnings of $1,120 for two pay periods), which could indicate Andreyuk was sometimes paid overtime. This, of course, is inconsistent with Defendants' argument that Andreyuk was an exempt employee who was not entitled to overtime. Andreyuk also earned above his alleged salary after his rate of pay was increased to $1,080 per week on November 8, 2018. *See* Defs.' 56.1 Statement ¶ 29. Between November 8, 2018 and April 4, 2019 (the date of Andreyuk's final paycheck), Andreyuk earned $1,200 in 10 out of 17 pay periods. El-Hag Decl. Ex. E at 9-11. That Andreyuk apparently regularly earned $120 more than his alleged salary again raises an issue of material fact regarding whether Andreyuk was a salaried employee.

There is a dearth of evidence in the present record explaining why Andreyuk's pay was raised or reduced during certain weeks and why it was raised or reduced by particular amounts, but there is information sufficient for a reasonable factfinder to infer that ASF's payments to Andreyuk were not consistent with an intention to pay him on a salary basis. Accordingly, issues of fact as to the first element of the "*bona fide* executive" exemption preclude summary judgment for Defendants on this question.

### b. Primary Duty of Management

There are likewise factual disputes concerning whether "management" was Andreyuk's primary duty during the period of his employment at ASF. DOL regulations define "management" to include a range of activities, such as:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs," 29 C.F.R. § 541.700(a), and provide the following list of nonexclusive factors to be considered in determining whether an employee's primary duty is management: (1) the amount of time spent on exempt versus nonexempt work; (2) "the employee's relative freedom from direct supervision"; (3) "the relative importance of the [employee's] exempt duties as compared with other types of duties"; and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.*

While the parties agree that Andreyuk had some sort of "lead" role on the construction yard—at least for the first year of his employment—they dispute the extent to which his role was managerial. For instance, the parties disagree as to whether Andreyuk had the authority to set

schedules for the other yard workers, *compare* Andreyuk Decl. ¶ 3 *with* Defs.' 56.1 Statement ¶ 20; participated in hiring and firing, *compare* Defs.' 56.1 Statement ¶¶ 22-23, 25 *with* Pls.' 56.1 Statement ¶ 40; and was responsible for overseeing management of material storage and equipment at the yard, *compare* Defs.' 56.1 Statement ¶ 15 *with* Pls.' Resp. to Defs.' 56.1 Statement ¶ 15.

But even assuming that Defendants could establish that Andreyuk had certain managerial responsibilities, there is insufficient evidence to determine whether management was Andreyuk's *primary* responsibility. In assessing this element, courts consider how a plaintiff allocated his time between exempt (managerial) duties and non-exempt (non-managerial) duties. *See, e.g.*, *Paganas v. Total Maint. Sol., LLC*, 726 F. App'x 851, 853-54 (2d Cir. 2018) (summary order) (a genuine issue of material fact existed as to whether plaintiff's primary duty was management where plaintiff presented evidence that 90 percent of his work was non-exempt manual labor); *Martinez*, 930 F. Supp. 2d at 524 (considering the percentage of an employee's time spent performing exempt versus nonexempt work). Here, neither party has put forward any evidence of the amount of time Andreyuk spent on exempt work versus nonexempt work. Defendants' position seems to be that virtually all of Andreyuk's duties were managerial insofar as they related to his responsibility of managing yard operations, *see* Defs.' Mem. at 7-8, and thus do not specify how much time Andreyuk spent on non-managerial tasks such as loading and unloading trucks. Plaintiffs' position is that Andreyuk performed manual labor "in addition to allegedly exempt work," without conceding that Andreyuk performed *any* exempt work. Pls.' Mem. at 17; *see* ECF No. 80 ("Pls.' Reply") at 4-5. On the present record, the Court is unable to assess the amount of time that Andreyuk spent doing exempt managerial work, and is left with the parties' conflicting accounts of Andreyuk's responsibilities. Because "[s]electing which of these

different depictions of [Andreyuk's] responsibilities to credit is a task for the jury, not the Court," the second element of the test for the "*bona fide* executive" exemption also makes summary judgment inappropriate here. *See Martinez*, 930 F. Supp. 2d at 525.

### c. Directing the Work of Two or More Employees

The third criterion—that an exempt employee "customarily and regularly" directs the work of two or more employees, 29 C.F.R. § 541.100(a)—also cannot be resolved on summary judgment. As discussed above, there are material factual disputes concerning the extent to which Andreyuk supervised other yard laborers at all.

Defendants assert that Andreyuk had substantial authority over "as many as eight [ ] employees," and that he directed the day-to-day duties of the employees he supervised. Defs.' 56.1 Statement ¶¶ 17-18.[16] Defendants also maintain Andreyuk had a role in scheduling for the other yard workers. *Id.* ¶ 20. Simao testified at her deposition that Andreyuk would "oversee" the other workers at the yard and that it was up to Andreyuk to "see whether [the work] was done correctly or incorrectly and make sure things were completed." Simao Dep. Tr. at 56:5-12.

---

[16] Andreyuk testified at his deposition that he "supervised workers for one year," Andreyuk Dep. Tr. at 82:5-10, but explained in his subsequent declaration—which is written in both Portuguese and English—that "[w]hen [he] used the wor[d] supervise in [his] deposition, [his] understanding of the wor[d] was that [he] just selected the jobs that [he] and [his] coworkers would work on and [he] would decide how [they] would accomplish the task." Andreyuk Decl. ¶ 3.

While "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony," *Kennedy v. City of New York*, 570 F. App'x 83, 84 (2d Cir. 2014) (summary order), that rule does not apply "in cases where there is a readily apparent, plausible explanation for the inconsistency, or where the deposition is only arguably contradictory to the affidavit," *Brandon v. Kinter*, 938 F.3d 21, 33 n.9 (2d Cir. 2019) (cleaned up). Andreyuk's declaration regarding his word choice during his deposition is an explanation based in part on language difficulties, rather than a contradiction of his prior deposition testimony; the Court considers the declaration on that basis.

Andreyuk also testified that he corrected the yard workers' mistakes and would advise them as to how to not make mistakes.  Andreyuk Dep. Tr. at 80:3-8.  But according to Plaintiffs, Andreyuk had no real authority over the yard laborers—he simply communicated directions from Fernandez.  In his declaration in support of Plaintiffs' summary judgment motion, Andreyuk explained that he "just selected the job that [he] and [his] coworkers would work on and [ ] would decide how [they] would accomplish the task" and that he "worked along side [the yard workers] hand in hand."  Andreyuk Decl. ¶ 3.  Even the ASF representatives testified that it was Andreyuk's job to follow Fernandez's directives.  Simao Dep. Tr. at 56:3-14; *see* Fernandez Dep. Tr. at 22:21-23:5 ("Clean up, I tell him to clean up, tell him to organize material, things like that.").  Further, as discussed above, there are disputes concerning whether Andreyuk was responsible for setting schedules, *compare* Andreyuk Decl. ¶ 3 *with* Defs.' 56.1 Statement ¶ 20, and had any role in personnel decisions, *compare* Defs.' 56.1 Statement ¶¶ 22-23, 25 *with* Pls.' 56.1 Statement ¶ 40.

In addition to the factual disputes about Andreyuk's role vis-à-vis the other yard workers, the parties also dispute whether Andreyuk directed other employees "customarily and regularly." Plaintiffs contend that Andreyuk held the role of "lead yard worker" for only one year and after that time, another employee took over the job.  Pls.' 56.1 Statement ¶ 39; Andreyuk Dep. Tr. at 82:5-22.  Defendants maintain that Andreyuk held a supervisory position for the entirety of his employment, *see* Defs.' 56.1 Statement ¶ 13, and that other employees performed the supervisory duties assigned to him only when Andreyuk was not working, *see* Simao Dep. Tr. at 58:3-11.

Because there is conflicting testimony presenting genuine issues of material fact concerning Andreyuk's authority over other employees, and as to whether Andreyuk

"customarily and regularly" directed the work of two or more employees, the third element of the test for the "*bona fide* executive" exemption also is not susceptible to summary judgment.  *See Karropoulos v. Soup du Jour, Ltd*., 128 F. Supp. 3d 518, 533-34 (E.D.N.Y. 2015) (denying summary judgment where parties disputed the extent to which chef supervised other employees on kitchen staff); *Martinez*, 930 F. Supp. 2d at 527.

### d.  Recommendations Given Particular Weight

The final element of the "*bona fide* executive" exemption analysis is whether Andreyuk "ha[d] the authority to hire or fire other employees" or whether his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight."  29 C.F.R. § 541.100(a)(4).

Once again, the evidence in the record contains contradicting accounts from the parties. Fernandez testified that Andreyuk had the authority to fire workers who were "doing something stupid," Fernandez Dep. Tr. at 95: 4-8, while Andreyuk stated he "was not responsible for . . . managing personnel," Andreyuk Decl. ¶ 3.  And although there is evidence that Andreyuk made recommendations to Fernandez regarding employee retention and termination, *see* Fernandez Dep. Tr. at 30:5-19, there is no evidence that Fernandez accorded Andreyuk's recommendations any "particular weight."  Fernandez testified that in the course of his employment, Andreyuk had, on occasion, communicated to Fernandez that certain employees should be dismissed.  *Id.* at 30:5-11 (when "there were too many men working in the yard," Andreyuk "used to tell [Fernandez] to fire them").  But based on this testimony, it is not clear what weight, if any, Fernandez gave to Andreyuk's recommendations, and it is clear that Fernandez would make the ultimate decision of whether to fire a worker or to reassign them.  *Id.* at 30:5-22 (Fernandez testified that Andreyuk would report to Fernandez, "We don't need this guy.  I don't like that

guy.  I don't like his work.  And he – I used to take him away from the job.  If I see – I find the

thing, I fire them.  If not, they go to another project, another job.").  Furthermore, Fernandez

testified he could not remember the names of any individuals who Andreyuk told him to fire, and

could not remember how frequently Andreyuk made such personnel recommendations.  *Id.* at

31:3-19.  Meanwhile, Andreyuk testified that while he made suggestions to Fernandez regarding

employee staffing and wages, Fernandez "did not listen to [him]" and "did what he wanted to

do."  Andreyuk Dep. Tr. at 80:12-81:9.  In light of the ambiguous evidence and in the absence of

"any examples in the record in which [Andreyuk's] input was used as a basis to either fire or

promote any employee," *see Martinez*, 930 F. Supp. 2d at 527, it is impossible for the Court to

determine as a matter of law that Defendants have satisfied this element of the "*bona fide*

executive" exemption.

*   *   *   *   *

For the reasons set forth above, there are numerous factual disputes in the record that

preclude the Court from granting summary judgment as to Andreyuk's claims for minimum

wages and overtime wages under the FLSA and NYLL.  Because there are questions of fact as to

whether the "*bona fide* executive" exemption applies to Andreyuk, both parties' motions for

summary judgment as to the first, second, fifth, and sixth causes of action in the First Amended

Complaint as to Andreyuk are DENIED.

### 2.   Felippelli's FLSA and NYLL Overtime Wages Claim

Plaintiffs assert that Felippelli, an hourly employee, was not properly compensated by

Defendants for all of the hours that he worked.  While Felippelli himself did not provide any

sworn testimony or declaration prior to his death to attest to the hours he worked during his

period of employment with ASF, Plaintiffs contend that because ASF's time records are

21

"incomplete, unreliable, and inaccurate," the Court must credit Andreyuk's estimation of the hours Felippelli worked.  Pls.' Mem. at 4, 12-13.

### a.  Burden of Proof under the FLSA and NYLL Where No Records Exist

An employee bringing an action for unpaid wages pursuant to the FLSA bears the burden of proving "'that he performed work for which he was not properly compensated.'"  *Santillan v. Henao*, 822 F. Supp. 2d 284, 293-94 (E.D.N.Y. 2011) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded on other grounds by* The Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251, *et seq.*).

"When an employer fails to maintain accurate and complete records of the hours employees work and the amounts they are paid, the plaintiff-employee need only submit sufficient evidence from which violations of the FLSA and the amount of an award may be reasonably inferred."  *Teofilo v. Real Thai Cuisine Inc.*, No. 18-cv-7238 (KPF), 2021 WL 22716, at *3 (S.D.N.Y. Jan. 4, 2021) (cleaned up).  "In effect, in the absence of employer records, the employee's testimony assumes a rebuttable presumption of accuracy."  *Shi v. TL & CG Inc.*, No. 19-cv-8502 (SN), 2022 WL 2669156, at *7 (S.D.N.Y. July 11, 2022) (quotation marks omitted). "Although . . . not all employees need testify in order to prove FLSA violations or recoup back-wages, the plaintiffs must present sufficient evidence for the [factfinder] to make a reasonable inference as to the number of hours worked by the non-testifying employees."  *Grochowski v. Phoenix Constr*, 318 F. 3d 80, 88 (2d Cir. 2003).  Under both the FLSA and NYLL, the presumption that an employee's testimony is accurate "may be rebutted where the employee's attestations are materially inconsistent with the facts and/or contradicted by the employer's witnesses."  *Shi*, 2022 WL 2669156, at *7.

Under the NYLL, "an employer who fails to keep accurate records shoulders a more stringent burden of proof"; the New York statute provides that an employer who fails to maintain

the appropriate records "'shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements.'"  *Teofilo*, 2021 WL 22716, at *3 (quoting NYLL § 196-a(a)).

### b.   Records from the Time of Hiring through April 2018

Defendants concede that from the time of Felippelli's hiring in or around June 2017 through April 2018, there are no records of the hours that he worked.  ECF No. 78 ("Defs.' Reply") at 10.  Defendants contend that Felippelli was compensated for all the hours that he worked, "as reported by Plaintiff Andreyuk"—according to Defendants, Andreyuk reported Felippelli's hours via timesheets, which were then used as the basis for payroll payments to Felippelli.[17]  *Id.* at 11; *see also* Simao Dep. Tr. at 25:23-26:6.  But this argument does not address Defendants' lack of records of the hours Felippelli worked between June 2017 and April 2018.[18]  Defendants had an affirmative duty to maintain such records, *see* 29 U.S.C. § 211(c), and in the absence of such records, Plaintiffs may meet their burden of proof "by relying on recollection alone" to establish that they "performed work for which [they were] improperly compensated," *Santillan*, 822 F. Supp. 2d at 293-94.  That recollection may only be rebutted "where the employee's attestations are materially inconsistent with the facts and/or contradicted

---

[17] The timesheets themselves no longer exist.  Defendants attempt to cast blame on Andreyuk for any potential inaccuracies in the information included on the timesheets he allegedly put together for Felippelli, but that argument is without merit.  Defendants had a non-delegable duty to maintain accurate records of their employees' hours.  29 U.S.C. § 211(c); *see Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 944, 946 (2d Cir. 1959) (rejecting as inconsistent with the FLSA an employer's contention that its employee was precluded from claiming overtime not shown on his own timesheets, because an employer "cannot . . . transfer his statutory burdens of accurate record keeping, and of appropriate payment, to the employee" (citation omitted)).

[18] Pay stubs provided to Felippelli are not reliable as records of Felippelli's actual hours worked, given Defendants' position that the pay stubs do not reflect payment for overtime hours, which Felippelli requested to receive in cash.  *See* Simao Dep. Tr. at 88:8-89:22.

by the employer's witnesses." *Shi*, 2022 WL 2669156, at *7; *see also Grochowski*, 318 F.3d at 88.

Here, because there is no evidence from Felippelli himself regarding the hours that he worked; instead, Felippelli relies on the testimony of Andreyuk, who has stated that he "would see [Felippelli] come to work every day when he came in and when he would bring the work truck back and leave for the day," and that Felippelli "generally worked 6 days a week from 6:00 am to 6:00 pm for a total of 72 hours [per week]."  Andreyuk Decl. ¶ 6.  Defendants acknowledge that they do not have any first-hand knowledge of the hours that Felippelli worked during this time period, *see* Fernandez Dep. Tr. at 74:21-24; Simao Dep. Tr. at 85:16-18, but have produced evidence to negate Andreyuk's testimony that Felippelli "generally" worked every day from 6:00 a.m. to 6:00 p.m.  Specifically, biometric time records for Andreyuk from the period April 2018 through March 2019 show that at least during that time, Andreyuk regularly finished work before 6:00 p.m.  *See* El-Hag Decl. Ex. C; *see also* Pls.' 56.1 Statement ¶ 43 (Andreyuk concedes "the [b]iometric records reflect the general hours that he worked each week and that an average of these hours would reflect the same hours he generally worked every week").  When paired with Andreyuk's testimony that he closed the yard every night, Andreyuk Decl. ¶ 5, Andreyuk's own testimony contradicts the representation that Felippelli "generally worked" until 6:00 p.m., since Felippelli could not work past the time that the yard was closed.  Additionally, Simao testified that Felippelli would only start his day at the yard 90 percent of the time, Simao Dep. Tr. at 25:7-16, which means that on 10 percent of the days Felippelli worked, Andreyuk would not know what time Felippelli arrived at work.

Taken together, these material inconsistencies and contradictions preclude summary judgment on Felippelli's unpaid overtime claims under both the FLSA and NYLL.  The only

evidence before the Court as to Felippelli's work hours through April 2018, on the one hand, pay stubs that purportedly state the hours Felippelli worked every week and, on the other, Andreyuk's declaration that Felippelli generally worked six days per week for 12 hours per day every week.  But there is evidence that calls Andreyuk's credibility as to this assertion into question.  Even though Andreyuk's biometric records do not specifically indicate the work patterns of Andreyuk or Felippelli during the June 2017 through April 2018 timeframe, Andreyuk's statements regarding his observations of Felippelli do not make any distinctions among different time periods, and a reasonable jury could draw inferences regarding the earlier time period based on Andreyuk's testimony regarding the later time period.  Accordingly, summary judgment is not appropriate with respect to Felippelli's unpaid overtime claim for 2017 and early 2018 because "'[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"  *Shi*, 2022 WL 2669156, at *7 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

### c.  Records from April 2018 through January 2020

Plaintiffs likewise rely on Andreyuk's recollection of Felippelli's hours for the period April 2018 through January 2020.  As an initial matter, Andreyuk has no basis to provide evidence regarding Felippelli's hours between the date Andreyuk's employment with ASF concluded in March 2019 and the date Felippelli's employment ended in January 2020.  Any evidence that Andreyuk offers as to this period would be purely speculative and therefore inadmissible.  Because Plaintiffs do not offer any other evidence to substantiate the hours Felippelli worked between March 28, 2019 and January 23, 2020, Defendants' motion for summary judgment as to Felippelli's unpaid overtime claims between March 28, 2019 and January 23, 2020 is GRANTED.

As to the period from April 2018 through March 27, 2019, Plaintiffs again rely on Andreyuk's recollection as to Felippelli's working hours. In addition to the same potential challenges addressed above, Andreyuk's testimony regarding this time period is contradicted by Felippelli's biometric timekeeping records. For example, for the week of January 25, 2019 through January 31, 2019 Plaintiffs maintain that Felippelli worked 72 hours, El-Hag Decl. Ex. W at 4, consisting of six days of work when he worked from 6:00 a.m. to 6:00 p.m., Andreyuk Decl. ¶ 6. But according to the biometric records, Felippelli worked only five days this week and clocked out for the day at the following times: 4:59 p.m., 3:14 p.m., 4:20 p.m., 2:54 p.m., and 5:29 p.m. El-Hag Decl. Ex. K at 10. During this week, according to the biometric records, Felippelli never clocked out later than 5:29 p.m. and did not work a single day "from 6:00 a.m. to 6:00 p.m." *See id.* Similar inconsistencies exist throughout the evidence presented by both parties.

There is also the issue of the cash payments Defendants claim to have made for Felippelli's overtime hours. Defendants assert that Felippelli was fully compensated for any overtime he worked at the legally mandated rate of time-and-a-half, but that the overtime does not appear in every paycheck because Defendants paid Felippelli his overtime wages in cash, per Felippelli's request. *See* Simao Dep. Tr. at 86:7-88:15. The parties agree that Felippelli was, on occasion, paid in cash, Pls.' Resp. to Defs.' 56.1 Statement ¶¶ 60-61, but Plaintiffs dispute Defendants' assertions that any overtime hours that were not reflected in Felippelli's paystubs were paid in cash, *id.* ¶ 62 (citing deposition testimony by Simao in which Simao testified she does not know, and is unaware of any means of determining, which weeks Felippelli was paid partially in cash, *see* Simao Dep. Tr. at 89:18-22). Again, there is no evidence from Felippelli concerning the amount of cash he received, or otherwise rebutting Simao's testimony that he was

fully compensated with a combination of cash and checks.  The only evidence in the record

regarding the cash payments is from Simao, who testified that Felippelli was paid in cash, though

she does not remember how often.  On the current record, this is not sufficient for Defendants—

who appear to have failed to maintain appropriate records regarding payments allegedly made

for overtime hours worked by Felippelli—to satisfy their burden, under the NYLL, "of proving

that the complaining employee was paid wages, benefits, and wage supplements."  NYLL § 196-

a; *see Santillan*, 822 F. Supp. 2d at 294.

In the end, the Court is left with conflicting evidence concerning Felippelli's overtime

hours and the amount that he was compensated.  To determine whether Felippelli was underpaid

for the overtime he worked would require the Court to make impermissible credibility

determinations as to both Simao and Andreyuk, *see Fischl*, 128 F.3d at 55-56, which the Court

declines to do.  Accordingly, there are factual issues in dispute, and matters that must be reserved

to a finder of fact at trial, with respect to the bulk of Felippelli's claim for unpaid overtime.

While Defendants' motion for summary judgment regarding the first and second causes of action

as to Felippelli is GRANTED for the period March 28, 2019 through January 23, 2020, both

parties' motions as to these causes of action for Felippelli are DENIED from the date Felippelli

was hired through March 27, 2019.

### 3.  Felippelli's FLSA and NYLL Minimum Wage Claims

Plaintiffs have not come forward any evidence to demonstrate that Felippelli did not

receive the appropriate minimum wage while he was employed by ASF.  Plaintiffs concede that

Felippelli received a regular rate of pay of $25 per hour when he was hired in 2017, and that his

pay rate increased to $30 per hour in 2019.  Pls.' Resp. to Defs.' 56.1 Statement ¶¶ 48-49.

Throughout the relevant time period, the federal minimum wage was $7.25 per hour, *see* 29

U.S.C. § 206(a)(1), and the New York State minimum wage in Westchester County ranged from

$10.00 to $13.00 per hour, NYLL § 652(1)(b); *see History of the Minimum Wage in New York State*, available at https://dol.ny.gov/history-minimum-wage-new-york-state (last visited Sept. 30, 2022).  Felippelli's regular rate of pay therefore exceeded both federal and state minimum wage standards throughout his employment with ASF.

Moreover, Plaintiffs have not offered any response in their briefing to Defendants' arguments regarding the claim for failure to pay Felippelli an appropriate minimum wage rate, and the Court construes this as an abandonment of that claim.  *Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned").  Accordingly, Defendants' motion for summary judgment as to the fifth and sixth causes of action in the First Amended Complaint is GRANTED with respect to Felippelli.

## C.  Plaintiffs' NYLL Claims for Failure to Pay Wages

Plaintiffs' third cause of action is pled as a violation of NYLL § 191, which provides that "[a] manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned."  NYLL § 191(1)(a)(i).  The definition of "manual worker" includes laborers, which plainly includes construction workers.  *Id.* § 190(4); *see also Cuzco v. Orion Builders, Inc*., No. 06-cv-2789 (KMW) (THK), 2010 WL 2143662, at *4 (S.D.N.Y. May 26, 2010) (finding that construction workers are manual workers for the purposes of NYLL § 191(1)(a)(i)).[19]

---

[19] Defendants have made no argument that, as a driver, Felippelli was not a "manual worker" within the meaning of NYLL § 191.  Accordingly, the Court assumes, without deciding, that Felippelli was a "manual worker" within the meaning of New York state law for purposes of deciding these motions.

There is no dispute that Defendants paid both Plaintiffs wages on a weekly basis. Andreyuk testified that he was paid weekly, *see* Andreyuk Dep. Tr. at 20:4-12, and payroll records generally reflect weekly payments.  In any event, Plaintiffs appear to have abandoned their claim under NYLL § 191 with respect to Andreyuk.  *See* Pls.' Mem. at 20-21.  Again, because Plaintiffs have failed to offer any arguments regarding this claim in response to Defendants' summary judgment motion, the Court concludes that Plaintiffs have abandoned it. *See Jackson*, 766 F.3d at 198.

As for Felippelli, the evidence in the record is entirely focused on Felippelli's claim for unpaid overtime, as opposed to the timing of payments made to him.  Because Plaintiffs have put forth no evidence that Felippelli did not receive wages in a timely manner, this cause of action must be dismissed as to Felippelli as well.  To the extent Felippelli's claim for unpaid overtime includes allegations that he was not paid at all for certain hours of overtime, if a jury determines that Defendants are liable to Felippelli for non-payment of certain hours, damages can be calculated in connection with Felippelli's first and second causes of action; there is no basis to maintain a separate cause of action pursuant to NYLL § 191 for those same alleged damages where, as here, payroll records indicate that Felippelli was regularly paid on a weekly basis. Zabell Decl. Ex. 5; El-Hag Dec. Ex. L; *see also* El-Hag Decl. Ex. W (Felippelli damages computation).

Accordingly, Defendants' motion for summary judgment as to the third cause of action in the First Amended Complaint is GRANTED as to both Plaintiffs.

### D. Plaintiffs' NYLL Wage Notice Claims

Finally, Plaintiffs and Defendants both argue they should be granted summary judgment as to Plaintiffs' claims that Defendants failed to provide wage notices in violation of NYLL §

195.  The NYLL requires employers to provide annual wage notices to employees hired after April 9, 2011, and to provide each employee with accurate wage statements at the time wages are paid.  *See* NYLL §§ 195(1)(a), (3).

Defendants do not dispute that they failed to provide Plaintiffs with such notices, but assert that they are protected by the statutory affirmative defense set forth in NYLL § 198(1-d) because they made complete and timely payment of all wages due.  Defs.' Mem. at 9, 13.  Because the Court has determined that summary judgment is not warranted either as to the "*bona fide* executive" exemption for Andreyuk or as to whether Felippelli was fully compensated for the overtime hours he allegedly worked, *see supra* Sections II.B.1, II.B.2, Plaintiffs' wage notice claims—and Defendants' affirmative defense as to those claims—cannot be resolved on summary judgment.  *See Elghourab v. Vista JFK, LLC*, No. 17-cv-911 (ARR) (ST), 2018 WL 6182491, at *10 (E.D.N.Y. Nov. 27, 2018) (denying summary judgment on wage notice claim because claim depends on the plaintiff's exempt status); *Camara v. Kenner*, No. 16-cv-7078 (JGK), 2018 WL 1596195, at *10 (S.D.N.Y. Mar. 29, 2018) (denying summary judgment on wage notice claim where question of fact remained as to whether defendants paid plaintiff all wages he was owed).  Accordingly, both parties' summary judgment motions as to the fourth cause of action in the First Amended Complaint are DENIED as to both Plaintiffs.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 68) is

GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion for summary

judgment (ECF No. 72) is DENIED.

An in-person status conference is hereby scheduled for October 19, 2022 at 12:00 p.m. in

Courtroom 250 in the White Plains federal courthouse.  In advance of the conference, counsel

must meet and confer to discuss potential trial dates between January and June 2023.


Dated: September 30, 2022
       White Plains, New York

                                        **SO ORDERED.**


                                        _____
                                        ANDREW E. KRAUSE
                                        United States Magistrate Judge